IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SPARROW BARNS & EVENTS, LLC, | §§§§§§§§§§§§ | |
| *Plaintiff*, | | No. 4:19-cv-00067 |
| v. | | JURY DEMAND |
| THE RUTH FARM, INC, | | |
| *Defendant*. | | |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**

I. INTRODUCTION

Plaintiff seeks temporary injunctive relief to prevent further damage to its goodwill, loss of reputation, and consumer confusion caused by Defendant's infringement of its interior trade dress in the Grand Hall of The White Sparrow.[1] *See Pl.'s Compl.*, Count Two (ECF No. 1).

II. FACTUAL BACKGROUND

A. The White Sparrow

Plaintiff Sparrow Barns & Events, LLC, is the owner of The White Sparrow® venue in Quinlan, Texas. The White Sparrow is a wedding and event venue. It is owned and run by the Huerta and Ramos families. The planning, design, and construction of The White Sparrow venue was also a family endeavor. Decl. of Nadia Ramos, ¶ 3. Nadia Ramos (formerly Nadia Huerta), a managing member of Plaintiff, dreamed of a custom-designed, innovative facility that would be the first of its kind in the wedding industry. Mrs. Ramos' father, John Huerta, is a general contractor who has handled numerous commercial projects and she knew that he was capable of ensuring that her dream and vision became a reality. *Id.* at ¶ 3-4.

Mrs. Ramos and her mother, Wanna Huerta, began developing plans for The White Sparrow in 2012. *Id*. The pair invested substantial amounts of time, labor, and creativity in the design and rustic elegance of The White Sparrow and that investment culminated in the construction of The White Sparrow by Mrs. Ramos' father, John Huerta. *Id.* at ¶ 5; *see also* Decl. of John Huerta, ¶ 2. From the concept to the design, to the planning, to the labor and to the construction, this venue was a labor of love and a family effort. Knowing that the venue was the

---

[1] Because Local Rule CV-7(a)(1) does not specify if a motion for temporary injunctive relief qualifies for the thirty page dispositive motion limitation, the undersigned's office contacted the Eastern District Sherman division clerk's office, who instructed that its Motion would be considered and to file with the current page length. If a Motion for Leave to file an Overlength Brief is required, Plaintiff will submit this Motion.

first and only of its kind in the United States and that the venue was unique, Mrs. Ramos and Mrs. Huerta sought copyright registration for the plans and for the constructed venue, which they received via Copyright Registration No. VAu-1-203-507 ("Copyrighted Work"). Ex. 1; *see also* Decl. of Nadia Ramos, ¶ 6.

The White Sparrow venue has been open close to five years and is one of the most well-known wedding venues in the United States. *Id*. at ¶¶ 8-9; *see also* Decl. of Marissa Lothschutz, ¶ 3. Brides travel from across the United States and from overseas to have their wedding at The White Sparrow. Decl. of Nadia Ramos, ¶ 9. The White Sparrow has been recognized for its unique design in publications across the country and has been voted one of the Best Wedding Venues in America. *Id*. at ¶10. Through family effort, hard-work, and determination, The White Sparrow has been quite successful. Due to those efforts, Plaintiff has accumulated substantial consumer goodwill in its brand and interior trade dress.

As Plaintiff's success grew, so did the calls from individuals and businesses seeking to replicate The White Sparrow. *Id*. at ¶ 11. Plaintiff has never licensed the Copyrighted Work or the trade dress, nor does it intend to. *Id*. at ¶ 12. After fielding many of these calls and inquiries, Plaintiff included the following copyright notice on its website and social media accounts:

> "The White Sparrow® Barn is a registered architectural work under the United States Copyright Act. As a registered work, White Sparrow® may recover statutory damages up to $150,000 per work, or actual damages, and its attorney fees incurred for pursuing infringement."

Ex. 2; *see also* Decl. of Nadia Ramos, ¶ 13. The White Sparrow is very diligent in monitoring and policing its intellectual property. *Id*. at ¶ 14.

  B. *Defendant The Ruth Farm, Inc.*

Defendant The Ruth Farm, Inc., owns a competing wedding venue, called The Nest. The Nest is owned by Christopher and Lawanna Thompson. The Nest was built in Ponder, Texas, less than ninety miles from The White Sparrow. Ex. 3.

  1. Defendant's Actions

On June 29, 2016, Plaintiff received an email from an individual named Courtney Wood, requesting a tour of The White Sparrow venue. Decl. of Anthony Ramos, ¶ 4. Ms. Wood stated in her email that she had an "upcoming wedding" in "February or March," that she had previously been inside the venue for another wedding and that she had "[fallen] in love with it." Ex. 4. The White Sparrow arranged for Ms. Wood to take a private, guided tour of the venue on July 14, 2016. Ms. Wood brought her family to the tour, including her mother and father, Christopher and Lawanna Thompson. Decl. of Anthony Ramos, ¶ 5.

During the Thompson family's tour of the venue, multiple photographs of the venue and hand-written notes were taken. During the tour, Mr. Thompson wandered away from the group to view other areas of the venue on his own. *Id*. at ¶ 6. Once a manager noticed this activity and asked Mr. Thompson to rejoin the tour, Mr. Thompson returned. *Id*. at ¶ 7. After the tour of the venue, the Thompson family left with their photographs and notes. *Id*. at ¶ 8.

At the time, the owners of The White Sparrow did not know the Thompson family and believed that the family was touring the venue for their daughter's upcoming wedding. It was later determined that the "upcoming wedding" story was merely a ruse to gain access to the venue. Public records show that Courtney Wood has never been married and that she did not hold a wedding in February or March of 2017. Her false statement regarding her "upcoming

wedding" was made simply under the pretense of gaining access to The White Sparrow in advance of the Thompsons creating their replicated venue.

A few months later, the Thompsons again reached out to The White Sparrow. Not satisfied with their plan to steal the venue's design, look, and feel, the Thompsons apparently wanted to adopt The White Sparrow's business model as well. Lawanna Thompson, still continuing with the "upcoming wedding" guise, emailed the owners of The White Sparrow to ask if they offered any weekly options, if they provided any discounts to customers, and what requirements The White Sparrow had in regard to payments. Ex. 5.

On February 19, 2017, the White Sparrow held an open house for the public and interested vendors. Decl. of Nadia Ramos, ¶ 16. The unscrupulous behavior of the Thompsons continued, as Christopher and Lawanna Thompson were again present at the venue scheming to gain further information. John Huerta, who managed construction of the venue through his construction company, was present at the open house event. Decl. of John Huerta, ¶ 4. After learning that Mr. Huerta was the general contractor for The White Sparrow, Mr. Thompson asked Mr. Huerta very pointed questions about how the venue was constructed. Mr. Thompson specifically inquired how the decorative columns in the Grand Hall were constructed. *Id*. at ¶ 9. He also asked if the venue was refurbished or constructed from scratch, if it was a steel or wood building frame, how long the construction took, and where the wood used in the venue was sourced from. *Id*. at ¶¶ 7-8. Though several areas of the venue were closed to the public for the event, Mr. Thompson snuck into and viewed some of these closed-off areas of the venue, such as the catering kitchen. *See* Nadia Ramos Decl., ¶¶ 17-19. When Mr. Thompson was advised he needed to leave the area by Nadia Ramos, he became exceedingly defensive and left immediately with his wife. *Id*.

2. Defendant Constructs its Infringing Venue.

Despite express verbal notice that The White Sparrow was subject to copyright protection, Defendant moved forward with its scheme to replicate The White Sparrow. Defendant began constructing its replicated venue in the spring of 2017, with a planned opening date of summer 2017. Even before Defendant held its grand opening open house for the public, consumer confusion ensued. As Defendant planned and constructed its venue, it had released concept photographs of the soon-to-be completed venue and photographs of the construction in progress. Decl. of Nadia Ramos, ¶ 15.

Plaintiff immediately began hearing from potential customers and vendors. Many wanted to know if Plaintiff was the owner of the new venue, or if Plaintiff had granted permission for Defendant to replicate its venue. On June 14, 2017, Anthony Ramos, a manager with Plaintiff, called a phone number associated with The Nest. *See* Decl. of Anthony Ramos, ¶¶ 10-12; *see also* Ex. 6. Whitney Wood, daughter of Christopher and Lawanna Thompson, answered the phone call. *Id*. Mr. Ramos informed Ms. Wood that he was a manager of The White Sparrow and that he was aware that the Thompson family was constructing a replicated venue. *Id*. Mr. Ramos informed Ms. Wood that The White Sparrow was protected by both copyright and trade dress law, but that The White Sparrow always worked with other venues to provide them an opportunity to make changes to the venue in lieu of pursuing legal action. *Id*. Ms. Wood stated that she had no idea that The White Sparrow was copyrighted and that they had "tried to make changes" when building The Nest. *Id*. She instructed Mr. Ramos that she would talk to the builder. *Id*.

Days later, Christopher Thompson phoned The White Sparrow, asking to speak to Anthony (Mr. Ramos). *Id*. ¶¶ 13-4; *see also* Ex. 7. Mr. Ramos answered the call and Mr.

Thompson immediately proceeded to threaten Mr. Ramos. He told Mr. Ramos to never call and threaten his daughter (Whitney Wood) again. *Id*. at ¶ 15. Mr. Ramos interrupted to let Mr. Thompson know that he was not threatening anyone, he was only trying to alert The Nest that it had copied The White Sparrow's IP and to try to save them time and money by dealing with this before construction on The Nest was completed. *Id*. at ¶ 16. Mr. Thompson told Mr. Ramos that he was "dumb" and that you "cannot copyright a barn." *Id*. at ¶ 17. Mr. Ramos, for the second time, instructed Mr. Thompson that yes indeed, The White Sparrow did obtain a copyright registration for its plans and the constructed venue. *Id*. Mr. Thompson then threatened to drive over to The White Sparrow to "kick [Mr. Ramos'] ass." *Id*. at ¶ 18. Mr. Thompson continued yelling verbal threats, Mr. Ramos stated it sounds The White Sparrow may need to pursue legal action, and Mr. Thompson hung up on Mr. Ramos. *Id*. at ¶ 19.

3. Consumer Confusion Grows

Social media became proliferated with instances of consumer confusion. Potential customers commented on photographs of Defendant's venue that they thought it was actually The White Sparrow on first glance. Others began tagging Plaintiff's social media accounts when the underlying photograph was not of Plaintiff's venue; rather, it was Defendant's. As questions from vendors and others mounted and instances of consumer confusion grew, Plaintiff took action to protect its intellectual property rights.

4. Sparrow Contacts Defendant about Confusion.

Plaintiff sent a cease and desist letter to Defendant on June 28, 2017, urging Defendant to cease its copyright and trade dress infringement. Ex. 8. Defendant responded to Plaintiff's letter with a flippant denial of its actions. *Id*. Plaintiff responded, outlining several of the facts regarding the plotting of the Thompson family and regarding consumer confusion to alert

Defendant that it was aware of its nefarious plan. *Id*. Defendant failed to respond to the second letter, despite representations through its counsel that it would respond.

After this lack of response, Plaintiff filed a lawsuit in this Court, Civ. Act. No. 4:17-CV-00558. Pursuant to the Scheduling Order this Court ordered Plaintiff and Defendant to mediate the claims involved in the original action by April 20, 2018. In good-faith, on April 17, 2018, Plaintiff and Defendant attended mediation with the Hon. Jeff Kaplan (Ret.) as mediator and paid the mediator's required fees. A compromise was reached among the Parties at mediation and the Parties executed a Settlement Agreement.  Ex. A (placeholder Exhibit inserted until adjudication of the Agreed Motion to Seal).

Pursuant to the executed Settlement Agreement, Defendant was required to make certain agreed-upon changes to its venue by January 1, 2019, and was to notify Plaintiff within seven days from that it had complied with its obligations under the Agreement. *Id*. Defendant breached the Settlement Agreement by failing to make the changes required by the Agreement by January 1, 2019. Ex. A-1. Due to Defendant's actions prior to and during the original lawsuit, Plaintiff ensured that the Agreement reserved a right for it to reinstitute the claims in the original lawsuit against Defendant, with a breach of contract claim, in the event that Defendant breached.

Defendant has conducted itself with an air of impunity throughout the original matter and subsequently through its breach of the Settlement Agreement. Plaintiff seeks temporary injunctive relief from this Court ordering Defendant to (a) cease and desist from selling, offering for sale, distributing or advertising in commerce its services using the trade dress owned by Plaintiff and (b) remove from commerce any advertisement or offer to sale in commerce its services displaying the trade dress owned by Plaintiff, such as on its website, social media, and accounts with third parties.

### III.  ARGUMENT

Fed. R. Civ. P. 65 requires that a movant satisfy four elements to justify temporary injunctive relief: 1) some likelihood of success exists that movant will prevail on the merits; 2) the movant will suffer irreparable harm if the relief is not granted; 3) the movant's harm, if relief is denied, outweighs any potential harm caused if the relief is granted (balance of equities) and 4) granting relief will not disserve the public interest. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2001). "[Injunctive relief] is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).  Because the Court makes its determination with procedures that are less formal and on evidence less complete than that which will be present at trial on the merits, Plaintiff need not prove its case in full. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

#### A.  The White Sparrow is Likely to Prevail on the Merits of its Claim

1. Trade Dress Infringement

Trade dress refers to the total image and overall appearance of a product and it may include features such as color, texture, size, shape, color combinations, and design. *Two Pesos, Inc. v. Taco Cabana, Inc.*,, 505 U.S. at 764–65 n. 1, 112 S.Ct. 2753 (1992); *see also Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F. Supp. 2d 60, 68 (S.D.N.Y. 2003). It encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer. *Id*. The existence of non-distinctive elements does not eliminate the possibility of inherent distinctiveness in the trade dress as a

whole. *Two Pesos,* 505 U.S. at 763. The purpose of trade dress protection is to secure the goodwill of the subject business and to protect the ability of consumers in the relevant market to distinguish among competing products. *Id*.

Here, Plaintiff's trade dress includes the custom-framed, vaulted ceiling beams, the rustic whitewashing of the Grand Hall, the ornate, tiered candelabra chandeliers, the placement of the lighting fixtures, the selective back wall window design and placement, and the stylistic, wrapped vertical columns. These combined elements constitute the interior trade dress of the Grand Hall:

The Grand Hall, featured above in rendition form, is the single most photographed location in the venue. It has been used by celebrities, such as Joanna Gaines, and corporations, such as JCPenney, for commercial photography shoots. It is the most recognizable aspect of the venue and the most advertised interior room in the venue. Brides book the venue, sight unseen, based on photographs of the Grand Hall.

To prevail on its trade dress infringement claim, Plaintiff must establish (1) ownership of legally protectable trade dress (meaning it functions as a source indicator to consumers) and (2) likelihood of confusion. 15 U.S.C.A § 1051 et seq.

    a.  *Plaintiff is the Owner of Legally Protectable Trade Dress.*

Plaintiff is the owner of the distinctive trade dress of the Grand Hall of the White Sparrow. The Grand Hall features a large, open floor plan with exposed, decorative, wrapped and framed, vaulted wooden beams placed laterally across the wooden cathedral ceiling; exposed,

decorative, wrapped and framed wooden columns placed vertically along the wooden side walls; tiered exposed bulb candelabra chandeliers; rustic whitewashing of the wooden interior features; and a stylistic, stacked window display along the back wall. Currently, Plaintiff does not have federal registration for its trade dress. However, unregistered trade dress is protected under § 43 (a) of the Lanham Act if the trade dress is distinctive and nonfunctional. *See, e.g., Test Masters Educ. Servs., Inc. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015).

To establish that the trade dress of the White Sparrow is protectable, Plaintiff must show that the trade dress is distinctive. This may be achieved by proving that the intrinsic nature of the trade dress serves to identify a particular source, meaning the trade dress is inherently distinctive, or by demonstrating that the mark has acquired secondary meaning, meaning that the primary source of the trade dress to the relevant consuming public is to identify the source of the product. 15 U.S.C.A. §§ 1052, 1127. With trade dress, the question is "whether the combination of features creates a distinctive visual impression, identifying the source of the product." *Pebble Beach Co. v. Tour* 18 I, 155 F.3d 526, 536 (5th Cir. 1998) (citation omitted).

While the individual elements of Plaintiff's trade dress standing alone may not be inherently distinctive, it is the *combination* of those elements that is the focus of the inquiry, as a consumer viewing the venue online or in person perceives the combination in total and not the individual elements piecemeal. For the relevant market, the wedding industry, Plaintiff's Grand Hall is instantly identifiable as a source indicator for the White Sparrow. The venue is famous in the United States wedding industry. Ex. 9 ("I recently attended a styled shoot at *the world famous White Sparrow Barn* in Quinlan, Texas…"); ("…this conference …. took place at *the world famous White Sparrow Barn*…I'm so impressed with the thought that went into this venue."); ("White Sparrow Barn Bridal Portraits: These portraits] were taken in March at the

*famous white barn just outside of Dallas, Texas*…It's such a beautiful venue and you can easily see why it's known across the US!); ("The White Sparrow Barn as we all now (*sic*) by now is famous for it's (*sic*) rustic elegance.").

Trade dress will, in the vast majority of cases, be considered inherently distinctive by the Court (thus removing the requirement to illustrate secondary meaning). *See, e.g., Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 451 (S.D.N.Y. 2000) (quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997) ("Because there is a 'virtually unlimited number of ways to combine elements to make up the total visual image that constitutes a trade dress, 'a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection"); *see also Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir. 1981).

The elements selected for combination for Plaintiff's interior trade dress are unique décor elements. Plaintiff's trade dress consists of arbitrary and fanciful design elements that serve no function. For example, the vertical, wrapped columns are for stylistic purposes only, not for support. The vaulted, wrapped cathedral beams could have been inset beams or exposed beams, in lieu of the fanciful and stylized wrapping of the columns and beams. Ornate tiered chandeliers and their placement were not chosen for lighting functionality; rather, they were chosen as a stylistic décor element. The custom white-washing was applied to add to the rustic elegance of the Grand Hall. Each of the individual element was purposefully chosen and combined to constitute the distinctive trade dress of the Grand Hall. While these features may be unremarkable while segregated, they constitute protectable trade dress when aggregated.

Even if a jury were to find that Plaintiff's trade dress was not inherently distinctive, Plaintiff can certainly demonstrate secondary meaning. The White Sparrow invests substantial

time, labor, and money into its advertising expenditures each year. The interior Grand Hall has been featured in numerous, national publications. Ex. 10. Furthermore, the White Sparrow has over 30,000 followers among its various social media accounts and over 976,000 monthly views of its Pinterest page. Ex. 11. Consumers within the relevant market instantly recognize the Grand Hall as belonging to The White Sparrow.

Additionally, Plaintiff has been using its trade dress in commerce for nearly five years. The date of first use in commerce for Plaintiff's trade dress was March 18, 2014. Decl. of Nadia Ramos, ¶ 8. In less than thirty days from the filing of this Motion, Plaintiff has been using its trade dress in interstate commerce for a period of five years. Evidence of consumer confusion in this case illustrates secondary meaning: several consumers, upon viewing photographs of the Nest's replicated interior room, believed it to be White Sparrow. Ex. 12.

b. *Defendant is Using Plaintiff's Trade Dress in Commerce Without Authorization*

Although Plaintiff has been approached numerous times by individuals and businesses seeking to license its trade dress, Plaintiff has never granted a license and has no intention to. It certainly never granted permission to Defendant. Decl. of Nadia Ramos, ¶ 24. Quite the contrary, Defendant's agents were instructed multiple times to avoid replication of Plaintiff's venue. Defendant replicated Plaintiff's trade dress in direct contradiction to Plaintiff's demand to Defendant for it to cease doing so.

c. *Defendant's Use of Sparrow's Trade Dress is Causing Consumer Confusion.*

Eight non-exhaustive "digits of confusion" are employed to assess the likelihood of confusion:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, ... (7) any evidence of actual confusion[,]' ... [and] (8) the degree of care exercised by potential purchasers.

*Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019), as revised (Jan. 29, 2019). The digits "do not apply mechanically to every case and can serve only as guides, not as an exact calculus." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485 (5th Cir. 2004).

      i.    *Similarity of the Marks*






Plaintiff's Motion for Temporary Injunctive Relief      14




Any consumer observing the Grand Hall of the White Sparrow and Defendant's replicated interior hall will note the stark similarity. Frankly, considering that Defendant's agents intentionally gained access to Plaintiff's venue on false pretenses, took extensive photographs and notes and then later questioned the general contractor extensively as to how certain elements, such as the distinctive, wrapped vertical columns were achieved, it is no wonder that the Nest is a near-verbatim replication. This is what Defendant intended and thus, this factor favors a likelihood of confusion.

ii.   *Similarity of Services*

"'The greater the similarity between the products and services, the greater the likelihood of confusion.'" All. *for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 512 (5th Cir. 2018) (quoting *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc*., 628 F.2d 500, 505 (5th Cir. 1980)). There is no question that Defendant offers the exact same services as Plaintiff. Plaintiff and Defendant are both wedding venues. Both venues also rent their venue out for commercial or other private events. Defendant targets the exact same customer base that Plaintiff does: potential brides and customers looking for event facilities.

### iii. Similarity of Retail Outlets, Purchasers, and Advertising Media.

Defendant constructed its venue less than ninety miles from the White Sparrow. *See* Ex. 3. Defendant targets the same customers as Plaintiff, and it advertises its services in the same advertising channels as Plaintiff, including on the same websites and in the same magazines. Ex. 13.

In this technological age, wedding venues advertise online and social media is tantamount for brand recognition and sales. Brides often choose venues based on photographs alone and venue photographs are widely circulated and displayed on websites like Pinterest and Instagram and from wedding industry specific websites such as www.theknot.com. These are all marketing channels for wedding venues and both Plaintiff and Defendant utilize the exact same ones. Thus, this factor points to a likelihood of confusion.

### iv. Defendant's Intent

Defendant's agents lied to gain physical access to Plaintiff's venue, physically threatened Plaintiff's manager when instructed that aspects of the venue could not be replicated, and then proceeded to carte blanche adopt the trade dress of Plaintiff. "If a trade dress is adopted by a defendant with the intent of deriving benefit from the reputation of the plaintiff that fact alone may be sufficient to support the inference that there is a likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977 (11th Cir. 1983). There is no question that Defendant intended to piggyback off of the goodwill and success achieved by Plaintiff, as there is no other plausible explanation for such behavior. As this Circuit has previously noted, it is so easy for a business man who wishes to sell his goods upon their merits to select marks that cannot possibly be confused with his competitor's that "courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the

public may fail to distinguish between them." *Chevron Chem. Co.*, 659 F.2d at 704 (5th Cir. 1981) (quoting *Florence Manufacturing Co. v. J. C. Dowd & Co.*, 178 F. 73, 75 (2d Cir. 1910)). Accordingly, this factor favors Plaintiff.

       v. *Actual Confusion is Present in this Matter.*

  Evidence of actual confusion is present in this matter. *See* Ex. 12. From consumers noting that they saw photographs of Defendant's replicated interior and believed it to be the White Sparrow, to a professional photographer who could not even distinguish the two venues in her own photographs, consumers are confused. *Id*. If a professional photographer is unable to determine the difference between the two venues from her own photographs, how likely is it that a consumer viewing the photographs through the relevant marketing channels can? This is exactly what Defendant desired – funneling consumers away to its venue through deception. It is Defendant who stands to profit from this confusion.

     B. <u>Sparrow is Irreparably Harmed by Defendant's Infringement.</u>

  Plaintiff stands to lose not only customers who, through the marketing channel of online sales, books with Defendant's venue believing it to be Plaintiff's or associated with Plaintiff, it stands to lose the goodwill and reputation that it has spent years building and achieving. "If it is likely that confused persons will mistakenly attribute to plaintiff defects or negative impressions they have of defendant's goods or services, then the plaintiff's reputation is at risk." McCarthy on Trademarks and Unfair Competition, § 30:47.30 (4th ed.). "This threatened and actual loss of reputation and good will cannot adequately be compensated for in dollars and cents after the fact." *Id.*

  Here, the risk to Plaintiff's goodwill has already presented itself. Brides posting publicly seeking pricing information specifically for The White Sparrow were referred to Defendant's

venue because it is "similar to the Sparrow." *See* Ex. 12. Consumers, vendors, and others have called the owners of the White Sparrow to ask if they have finally agreed to license the Copyrighted work and trade dress of the venue or if they have constructed another venue in Ponder, Texas (referring to Defendant's venue). Vendors have asked why The White Sparrow hasn't sued The Nest for "literally steal[ing] everything." Decl. of Marissa Lothschutz, ¶ 10. Brides who planned to book The White Sparrow whose chosen dates were unavailable, elected to book with The Nest instead because it "looks just the same" instead of joining the waiting list or choosing another date. Decl. of Nadia Ramos, ¶27. A wedding planner recently asked The White Sparrow's wedding coordinator "[h]ow can that barn in Dallas be so similar to y'alls? … The inside is exactly the same." Decl. of Nadia Ramos, ¶26; *see also* Ex. 12. Additionally, Plaintiff invested substantial time and money into the original lawsuit in this matter. Defendant employed continuously dilatory and non-responsive tactics and then blatantly ignored a mutually negotiated settlement agreement achieved at mediation ordered by this Court last year. *See* Ex. A-1. This is willful infringement.

For each confused customer or customer funneled to The Nest because it copied Plaintiff, Plaintiff's suffers injury to its commercial interest in its goodwill and reputation.

### C. The Balance of Equities Favors Plaintiff.

In deciding whether to grant an injunction, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Dickey's Barbecue Pit, Inc. v. Celebrated Affairs Catering, Inc.*, No. 4:17-CV-00127, 2017 WL 1079431, at *4 (E.D. Tex. Mar. 22, 2017) (internal citation omitted). Here, injury to loss of goodwill, reputation, and customer confusion to Plaintiff outweighs any effect on

Defendant. This harm cannot be fixed by monetary damages. Defendant has no right to continue to use willfully Plaintiff's trade dress in commerce.

### D. The Injunction is in the Public Interest.

Trademark law aims to "protect the public from deceit" and to protect "investment from its misappropriation by pirates and cheats." *Two Pesos,* 505 U.S. at 782 n. 15 (1992) (Steven, J. concurring) (citing S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946)); *see also AMP Inc. v. Foy*, 540 F.2d 1181, 1185-86 (4th Cir. 1976) (stating the purpose of a trademark is to protect the public from confusion regarding the "identity of the enterprise from which goods and services are obtained."). The public has an interest in not being deceived or confused and for persons to comply with federal statutes and regulations regarding trademarks. *Dickey's Barbecue Pit*, No. 4:17-CV-00127, 2017 WL 1079431, at *4 (E.D. Tex. Mar. 22, 2017). Public interest is served where courts enjoin this type of behavior.

## IV.    CONCLUSION

All of the factors for the grant of temporary injunctive relief favor issuance of a temporary restraining order and preliminary injunction in this matter. Accordingly, Plaintiff's motion for temporary injunctive relief should be granted.

Respectfully Submitted,

*/s/ Chelsie N. Spencer*
Chelsie N. Spencer
Texas Bar No. 24094959

**RITTER SPENCER PLLC**
15455 Dallas Parkway, Suite 600
Addison, Texas 75001
Email: cspencer@ritterspencer.com
Telephone: 214.295.5070
Fax: 214.935.1778

ATTORNEYS FOR PLAINTIFF
SPARROW BARNS & EVENTS LLC

### CERTIFICATE OF SERVICE & NOTICE EFFORTS

Attorney Evan Stone has represented that he will be representing Defendant in this lawsuit. On February 15, 2019, Mr. Stone responded via email that his client would not permit him to accept or waive service of process on its behalf, as it did in the original lawsuit. Plaintiff is attempting to serve Defendant with the Complaint; however, Plaintiff was forced to use substitute service via the Secretary of State in the original lawsuit in this matter. Mr. Stone has not appeared in this matter yet and Plaintiff may again need to seek service through the Secretary of State if Defendant's registered agent yet again avoids service. Plaintiff has emailed a copy of this Motion and Memorandum to Mr. Stone and has sent a certified mailing to Defendant's registered agent to provide Notice of this Motion.

/s/ <i>Chelsie Spencer</i><br>
Chelsie Spencer