# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SPARROW BARNS & EVENTS, LLC | § | |
| | § | |
| v. | § | Civil Action No.  4:19-CV-00067 |
| | § | Judge Mazzant |
| THE RUTH FARM INC. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff Sparrow Barns & Events, LLC's ("Sparrow Barns")
Emergency Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. #3).
Having considered the motion and the relevant pleadings, the Court finds that the motion should
be granted.

## BACKGROUND

### I.    The White Sparrow

Sparrow Barns is owned and operated by the Huerta and Ramos families.  Nadia Ramos
dreamed of a custom-designed barn that could be used as a wedding and events venue.  Nadia
Ramos and her mother, Wanna Huerta, began developing plans for a venue in 2012.  After
completing the plans, Nadia's father, John Huerta—a general contractor—constructed the venue
in Quinlan, Texas sometime between 2012 and 2014.  The family named the venue the White
Sparrow.  Sparrow Barns is the official owner of the White Sparrow.

The White Sparrow is not simply a traditional barn used for weddings and events.  Inside
the White Sparrow is the Grand Hall.  The Grant Hall is framed like a traditional barn but
includes vaulted ceiling beams and wrapped vertical columns (Dkt. #3 at p. 10).  Lighting the
Grand Hall are "ornate, tiered candelabra chandeliers" and a "selective back wall window
design."  (Dkt. #3 at p. 10).   The walls of the Grand Hall are "rustically whitewashed" from

floor to ceiling (Dkt. #3 at p. 10).  Due to the unique aesthetic of the White Sparrow, Nadia Ramos and Wanna Huerta sought copyright registration for the White Sparrow (Dkt. #3 at p. 3).  On August 15, 2015, the United States Copyright Office issued a Certificate of Registration for the White Sparrow as an architectural work (Dkt. #3-5).

Since its opening in 2014, the White Sparrow gained a reputation in the wedding industry.  Publications recognize the White Sparrow for its design, and the White Sparrow has been voted one of the best wedding venues in the United States (Dkt. #3 at p. 3).  Additionally, couples travel from across the United States, and other parts of the world, to host their weddings in the White Sparrow while certain celebrities and large corporations use the White Sparrow for commercial photography shoots (Dkt. #3 at p. 1).   As a result, Sparrow Barns accumulated significant business from the White Sparrow and gained substantial customer goodwill (Dkt. #3 at p. 3).  But success often attracts imitation, and the success of the White Sparrow appears to have attracted the attention of another Texas family.

## II.    The Nest

Sparrow Barns alleges that on June 29, 2016, Courtney Wood contacted Sparrow Barns requesting a tour of the White Sparrow for her upcoming wedding (Dkt. #3 at p. 4).  Sparrow Barns arranged for Courtney Wood and her parents, Christopher and Lawanna Thompson, to take a private, guided tour of the venue on July 14, 2016 (Dkt. #3 at p. 4).  During the tour, Courtney Wood and her parents took multiple photographs and hand-written notes (Dkt. #3 at p. 4).  Christopher Thompson also reportedly left the tour to view other areas of the venue before a Sparrow Barns manager asked him to rejoin the tour (Dkt. #3 at p. 4).  A few months later, someone from the Thompson family contacted Sparrow Barns to ask about payment options and discounts (Dkt. #3 at p. 5).

On February 19, 2017, Sparrow Barns held an open house for the public and interested vendors to view the White Sparrow (Dkt. #3 at p. 5). Christopher and Lawanna Thompson attended the open house (Dkt. #3 at p. 5). Learning that John Huerta was a general contractor, Christopher Thompson asked John Huerta detailed questions about the construction of the White Sparrow (Dkt. #3 at p. 5). Later, Nadia Ramos found Christopher Thompson in a closed-off area of the White Sparrow and asked him to leave (Dkt. #3 at p. 5).

Sparrow Barns subsequently learned that Christopher and Lawanna Thompson were owners of Defendant the Ruth Farm Inc. ("Ruth Farm") (Dkt. #3 at p. 4). In 2017, Ruth Farm began constructing another avian-themed wedding and events barn in Ponder, Texas—about ninety miles northwest of the White Sparrow (Dkt. #3 at p. 4). Ruth Farm called its venue the Nest (Dkt. #3 at p. 4). Sparrow Barns provides a picture-to-picture comparison of the White Sparrow and the Nest:

**The White Sparrow**                                          **The Nest**

(Dkt. #1-2; Dkt. #1-4; Dkt. #3 at pp. 14–15).

## III. Notice

As Ruth Farm planned and constructed the Nest, it released concept photographs of the venue (Dkt. #3 at p. 6). After the release of the photographs, Sparrow Barns received questions from customers and vendors asking whether it was the owner of the Nest or whether it granted permission for Ruth Farm to build the Nest (Dkt. #3 at p. 6).

Anthony Ramos—a Sparrow Barns manager—called the Nest to inform its owners that the White Sparrow was protected by copyright and trade dress law (Dkt. #3-3). Whitney Wood, another daughter of Christopher and Lawanna Thompson, answered the call. Whitney Wood explained to Anthony Ramos that she knew of the White Sparrow but did not know it was

protected by law (Dkt. #3-3 ¶ 11). Whitney Wood also explained that the Thompsons "tried to make changes" to their venue before construction, but would talk to the builder again (Dkt. #3-3 at ¶¶ 11–12).[1]

Days later, Christopher Thompson called Anthony Ramos. Christopher Thompson told Anthony Ramos never to call and threaten his daughter again (Dkt. #3-3 ¶¶ 13–17). Anthony Ramos explained that he did not threaten Whitney Woody, but called to inform her of the intellectual property violations (Dkt. #3-3 ¶¶ 13–17). Christopher Thompson then called Anthony Ramos "dumb" and stated, "you can't copyright a barn." (Dkt. #3-3 ¶ 17). Anthony Ramos responded that you can copyright a barn and "we go after venues who try to copy us." (Dkt. #3-3 ¶ 17). Christopher Thompson then threatened to drive to the White Sparrow and "kick [Anthony Ramos's] a[**]." (Dkt. #3-3 ¶ 18).

## IV.    Legal Action

Sparrow Barns indicates that after the construction of the Nest, customer confusion grew. Specifically, social media users began mistaking the White Sparrow for the Nest in their comments on and tags of the venues (Dkt. #3 at p. 7). Sparrow Barns also began receiving inquiries from vendors who confused the venues (Dkt. #3 at p. 7).

On June 28, 2017, Sparrow Barns sent a cease-and-desist letter to Ruth Farm urging Ruth Farm to cease its copyright and trade dress infringement (Dkt. #3 at p. 7). Ruth Farm responded denying any infringement (Dkt. #3 at p. 7). Sparrow Barns replied outlining specific acts of infringement (Dkt. #3 at p. 8). Ruth Farm did not respond to Sparrow Barns' second letter.

After receiving no response to its second letter, Sparrow Barns filed suit against Ruth Farm in this Court on August 10, 2016 (the "First Suit"). *Sparrow Barns & Events LLC v. Ruth*

---

1. Christopher Thompson admits in his Declaration, "Lawanna [Thompson] and I were working on a barn-themed events venue and did take inspiration from the White Sparrow after visiting." (Dkt. #11-1 ¶ 3).

*Farm Inc.*, 4:17-CV-558-KPJ.  On April 17, 2018, the parties mediated the case and reached a compromise (Dkt. #3 at p. 8).  In the following Settlement Agreement, Ruth Farm agreed to make certain changes to the Nest by January 1, 2019, and to notify Sparrow Barns within seven days of completing the changes (Dkt. #3 at p. 8; Dkt. #7).  Sparrow Barns agreed to release its claims after confirming Ruth Farm completed the changes (Dkt. #3 at p. 8; Dkt. #7).

## V.    Back to Court

Sparrow Barns filed this suit against Ruth Farm on January 30, 2019 ("Second Suit") (Dkt. #1).  Sparrow Barns alleges that Ruth Farm did not comply with the Settlement Agreement. Sparrow Barns reasserts its claims from the First Suit along with a breach of contract claim. Ruth Farm filed an answer to the Second Suit on March 29, 2019 (Dkt. #15).

Before Ruth Farm filed its answer, Sparrow Barns filed the motion at issue on February 18, 2019 (Dkt. #3).   Sparrow Barns requests the Court enjoin Ruth Farm from:

> (a) . . . from selling, offering for sale, distributing or advertising in commerce its services displaying the trade dress owned by [Sparrow Barns] and (b) must remove from commerce any advertisement or offer to sale in commerce its services displaying the trade dress owned by [Sparrow Barns] on its website, social media, and accounts with third parties.

(Dkt. #3-19).

The Court set a hearing on the motion for March 1, 2019, and ordered Sparrow Barns to serve the order setting the hearing on Ruth Farm (Dkt. #6).  The Court then reset the hearing for March 11, 2019 (Dkt. #9).  Despite service and the resetting, Ruth Farm filed a response to the motion only seventeen minutes before the hearing (Dkt. #11).   At the hearing, the Court allowed both parties to argue the motion and present evidence (Dkt. #12).   The Court then provided Sparrow Barns a week to file a reply to the motion and denied Ruth Farm's request to amend its response (Dkt. #12).  Sparrow Barns filed its reply on March 15, 2019 (Dkt. #13).

## LEGAL STANDARD

When an opposing party receives adequate notice of, and an opportunity to be heard on, a motion for a temporary restraining order, the procedure that follows does not functionally differ from that of an application for a preliminary injunction. *See Harris Cty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 326 (5th Cir. 1999); *Dilworth v. Riner*, 343 F.2d 226, 229 (5th Cir. 1965) (citation omitted); *Empower Texans, Inc. v. Nodolf*, 306 F. Supp. 3d 961, 965 (W.D. Tex. 2018) (citing *Dilworth*, 343 F.2d at 229); *Jaroy Constr., Inc. v. La. State Licensing Bd. for Contractors*, CIV.A. 10-958, 2010 WL 1254717, at *1 (E.D. La. Mar. 24, 2010) (citation omitted). A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

The Court ordered Sparrow Barns to serve its order setting the hearing on Ruth Farm (Dkt. #6). Ruth Farm filed a response to Sparrow Barns' motion and Counsel for Ruth Farm appeared at the March 11 hearing to argue against the motion and present evidence (Dkt. #11; Dkt. #12). As Ruth Farm received notice of, and a fair opportunity to be heard on, the motion, the Court treats the motion as a motion seeking a preliminary injunction. *See CarMax Auto Superstores Inc.*, 177 F.3d at 326; *Dilworth*, 343 F.2d at 229; *Empower Texans, Inc.*, 306 F. Supp. 3d at 965; *Jaroy Constr., Inc.*, 2010 WL 1254717, at *1.

To prevail on its motion and obtain a preliminary injunction, Sparrow Barns must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat that Sparrow Barns will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause Ruth Farm; and (4) that the injunction will not disserve the public interest. *Nichols*, 532 F.3d at 372.

### I. Likelihood of Success on the Merits

Sparrow Barns contends it will succeed on its trade dress infringement claim. "The Lanham Act creates a cause of action for trade dress infringement. This action is analogous to the common law tort of unfair competition." *Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989) (citations omitted). "'Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product.'" *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010) (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998), *abrogated on other grounds by*, *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33 (2001)).

Trade dress protection has also been extended to the overall "motif" of a restaurant. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775 (1992). "The purpose of trade dress protection, like trademark protection, is to 'secure the owner of the [trade dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing products.'" *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (alteration in original) (quoting *Two Pesos, Inc.*, 505 U.S. at 775). To prevail on a trade dress infringement claim, a plaintiff must prove three elements: (1) the trade dress is inherently distinctive or has acquired a secondary meaning; (2) its trade dress is primarily nonfunctional and therefore protectable; and (3) there is a likelihood that the defendant's trade dress will lead to customer confusion. *Fantastic Sams Franchise Corp. v. Mosley*, CV H-16-2318, 2016 WL 7426403, at *7 (S.D. Tex. Dec. 23, 2016) (citing *Pebble Beach Co.*, 155 F.3d at 536); *Grand Time Corp. v. Watch Factory Corp.*, 3:08-CV-1770-K, 2011 WL 2412960, at *7 (N.D. Tex. June 10, 2011) (citations omitted).

### A. Inherently Distinctive or Acquisition of Secondary Meaning

#### i. Inherently Distinctive

Sparrow Barns does not possess a federal registration for its trade dress (Dkt. #3 at p. 11). However, unregistered trade dress is protected under the Lanham Act if the trade dress is distinctive and nonfunctional. *Test Masters Educ. Servs., Inc. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015). "Marks whose 'intrinsic nature serves to identify their particular source' are inherently distinctive." *AMID, Inc. v. Medic Alert Found. U.S., Inc.*, 241 F. Supp. 3d 788, 801–02 (S.D. Tex. 2017). Although Courts struggle to devise a test to determine when trade dress is inherently distinctive, caselaw provides useful guidance. *See id.* at 800–05. In *Two Pesos*, the Fifth Circuit upheld a jury verdict finding Taco Cabana's trade dress was

inherently distinctive. *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1120 (5th Cir. 1991), *aff'd sub nom*, *Two Pesos, Inc.*, 505 U.S. at 763. Taco Cabana described its trade dress as:

> [A] festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

*Id.* at 1117. The description of Taco Cabana's trade dress is like the description of Sparrow Barns' trade dress.

Sparrow Barns describes the trade dress of the Grand Hall in the White Sparrow:

> The Grand Hall features a large, open floor plan with exposed, decorative, wrapped and framed, vaulted wooden beams placed laterally across the wooden cathedral ceiling; exposed, decorative, wrapped and framed wooden columns placed vertically along the wooden side walls; tiered exposed bulb candelabra chandeliers; rustic whitewashing of the wooden interior features; and a stylistic, stacked window display along the back wall.

(Dkt. #3 at pp. 11–12). Like the trade dress in *Two Pesos*, Sparrow Barns can likely show that the trade dress of the Grand Hall is inherently distinctive because its intrinsic nature serves to identify its source as the White Sparrow.

Ruth Farm's response further demonstrates that the White Sparrow is inherently distinctive. Ruth Farm states that Sparrow Barns "is correct in its assertion that [Ruth Farm] has had a rather cavalier attitude about this case from the beginning." (Dkt. #11 ¶ 2). Ruth Farm argues that Sparrow Barns does not possess the "exclusive right to construct white barns" and Ruth Farm "has viewed numerous Barn[]s similar to plaintiff[']s barn. The White Sparrow Barn is a white barn, with components common to barns and event spaces, arranged in a practical,

obvious manner." (Dkt. #11 ¶ 3) (citations omitted). Ruth Farm then provides photographs of "other white barns" to support its argument. Oddly, a review of the photographs provided by Ruth Farm shows that the other white barns do not resemble the White Sparrow and, therefore, support the argument that the White Sparrow is inherently distinctive.

**The White Sparrow**                **The Nest**










 

(Dkt. #3-12 at pp. 5–7; Dkt. #11-1 at pp. 4–5).

**Ruth Farm's Photographs of "Other White Barns:"**

 

 










(Dkt. #11-1 at pp. 6–12).

Reviewing the photographs provided, two barns—the White Sparrow and the Nest—share many distinct similarities, including: internal and external shape, decorative columns, vaulted and beamed ceilings, candelabra chandeliers, picturesque haylofts, window arrangements, wooden flooring, large entrance doors, and rustic whitewash paint. The other

white barns, at best, share one or two of these features.[2]  As a result, the Court finds that Sparrow Barns can likely succeed in showing that the White Sparrow is inherently distinctive.

### ii.   Secondary Meaning

Even if Sparrow Barns cannot prove that the White Sparrow is inherently distinctive, Sparrow Barns can likely demonstrate that the White Sparrow developed secondary meaning. "Trade dress acquires distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning." *AMID, Inc.*, 241 F. Supp. 3d at 808.  To develop secondary meaning, a "'mark must denote to the consumer a single thing coming from a single source to support a finding of secondary meaning.'" *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 543 (5th Cir. 2015) (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983), *abrogated on other grounds*, *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004)).  "'The inquiry is one of the public's mental association between the mark and the alleged mark holder.'" *Amazing Spaces*, 608 F.3d at 247–48 (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008)).  Courts consider the following factors when determining whether a claimed trade dress acquired secondary meaning:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

---

2. Ruth Farm also provides a letter from architect Jennifer Alford (Dkt. #11-2).  Jennifer Alford compares drawings and photographs of the White Sparrow, the Nest, and other barns to conclude, "While some elements may be present in the design of the White Sparrow, as they are in all of the inspiration photos, certainly no Architectural Features are treated in the same manor, size, style, or proportion that is not indicative of this simple Barn Architectural style." (Dkt. #11-2 at p. 2).  As mentioned at the hearing and in Sparrow Barn's reply, Jennifer Alford's letter is unsigned and unverified.  Further, it appears Jennifer Alford considers only the architecture of the venues and not the other distinct factors contributing to Sparrow Barns' trade dress.  For example, the Court doubts Jennifer Alford would consider the candelabra chandeliers, decorative columns, or the unique window arrangement of the White Sparrow part of the traditional "Barn Architectural Style."

*Id.* at 248 (quoting *Smack Apparel Co.*, 550 F.3d at 476).

The Court considers the factors:

1. Sparrow Barns has used the White Sparrow's trade dress for nearly five years (Dkt. #3 at p. 13).

2. There is no direct evidence concerning the White Sparrow's volume of sales. However, there is evidence that the White Sparrow is a popular wedding and events venue (Dkt. #3-4; Dkt. #3-6). Therefore, the Court assumes a high volume of sales.

3. Sparrow Barns invests significant time, labor, and money into advertising the White Sparrow annually (Dkt. #3 at pp. 12–13).

4. The White Sparrow is often depicted in online publications, magazines, and photoshoots for large corporations and celebrities and is considered one of the top wedding venues in the United States (Dkt. #3 at pp. 3, 10; Dkt. #3-1; Dkt. #3-3; Dkt. #3-4; Dkt. #3-15). The White Sparrow also maintains a significant social media presence (Dkt. #3 at p. 13).

5. There is no consumer-survey evidence provided.

6. There is direct consumer testimony associating the White Sparrow with its trade dress (Dkt. #3-3; Dkt. #3-4; Dkt. #3-15; Dkt. #3-16; Dkt. #3-17).

7. There is evidence that Ruth Farm intended to copy the White Sparrow's trade dress, including: Christopher Thompson's admission that he took "inspiration" from the White Sparrow when designing the Nest; the Thompson's visits to the White Sparrow; the Thompson's questions about the White Sparrow; the notes and pictures taken by the Thompsons of the White Sparrow; and the evidence that Christopher Thompson viewed unauthorized areas of the White Sparrow (Dkt. #3-1; Dkt. #3-2; Dkt. #3-3; Dkt. #3-8; Dkt. #3-9; Dkt. #3-10; Dkt. #3-11; Dkt. #11-1 ¶ 3).

Considering the factors and evidence presented, the Court finds that Sparrow Barns can likely succeed in proving that the White Sparrow acquired secondary meaning. As Sparrow Barns can likely succeed in proving that the White Sparrow is either inherently distinctive or acquired secondary meaning, Sparrow Barns can likely succeed on the merits in proving the first element of its trade dress claim.

### B. Nonfunctional

To succeed on its trade dress claim, Sparrow Barns must also prove that its trade dress is nonfunctional. "The Lanham Act protects only nonfunctional distinctive trade dress, a limit that 'serves to assure that competition will not be stifled by the exhaustion of a limited number of trade dresses.'" *AMID, Inc.*, 241 F. Supp. 3d at 819 (quoting *Two Pesos*, 505 U.S. at 755). There are two tests to determine whether a product feature is functional—the traditional and competitive necessity tests. *YETI Coolers, LLC v. JDS Indus., Inc.*, 300 F. Supp. 3d 899, 913 (W.D. Tex. 2018). "The traditional test of functionality is whether the product feature 'is essential to the use or purpose of the article or if it affects the cost or quality of an article.'" *AMID, Inc.*, 241 F. Supp. 3d at 819 (quoting *TrafFix*, 532 U.S. at 32). "Under this definition, 'if a product feature is the reason the device works, then the feature is functional.'" *YETI Coolers*, 300 F. Supp. 3d at 913 (quoting *Ritter*, 289 F.3d at 355). "'Essential,' as used in the traditional test of functionality . . . is a term of art, used to distinguish product features that only serve to identify a product's source from those that serve 'any other significant function.'" *Poly-Am., L.P. v. Stego Indus., L.L.C.*, 3:08-CV-2224-G, 2011 WL 3206687, at *10 (N.D. Tex. July 27, 2011), *aff'd sub nom. Poly-Am., L.P. v. Stego Indus., LLC*, 482 F. App'x. 958 (5th Cir. 2012)). Under the competitive necessity test, a feature is functional "if the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Ritter*, 289 F.3d at 356. "Even if individual constituent parts of a product's trade dress are functional, 'a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.'" *YETI Coolers*, 300 F. Supp. 3d at 913 (quoting *Two Pesos*, 92 F.2d at 1119). In other words, "'in order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive

way.'" *Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 701 (S.D. Tex. 2013) (quoting *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003)). Therefore, the question is not whether some component of a product's trade dress is functional but whether the entirety of a product's trade dress is functional. *Id.* (citing *Two Pesos*, 92 F.2d at 1119).

Sparrow Barns can likely succeed in showing its trade dress is nonfunctional. Sparrow Barns describes the trade dress of the White Sparrow:

> The Grand Hall features a large, open floor plan with exposed, decorative, wrapped and framed, vaulted wooden beams placed laterally across the wooden cathedral ceiling; exposed, decorative, wrapped and framed wooden columns placed vertically along the wooden side walls; tiered exposed bulb candelabra chandeliers; rustic whitewashing of the wooden interior features; and a stylistic, stacked window display along the back wall.

(Dkt. #3 at pp. 11–12). These features are not functional because none enable the White Sparrow to operate as a wedding venue. For example, the White Sparrow could host weddings and events with glass chandeliers, laminate flooring, and a different window arrangement. However, even if one considered the features comprising the White Sparrow's trade dress functional, the functional features are combined in an arbitrary and fanciful way to create a distinct venue. Therefore, under the traditional test, the White Sparrow's trade dress is likely nonfunctional.

Further, the exclusive use of the combination of these features does not place competitors at a significant non-reputation-related disadvantage. Competitors of the White Sparrow may employ many different combinations of architectural and decorative features to distinguish their venues from the White Sparrow without infringing on Sparrow Barns' trade dress. In fact, the photographs of the "other white barns" presented by Ruth Farm demonstrate how other white-barn-wedding venues may distinguish their venues from the White Sparrow. Accordingly,

Sparrow Barns can likely succeed on the merits—under the traditional and the competitive necessity tests—in proving its trade dress is nonfunctional.

### C.  Customer Confusion

Finally, to succeed on its trade dress claim, Sparrow Barns must demonstrate that there is a likelihood of customer confusion.  "'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion."  *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009) (citing *Smack Apparel*, 550 F.3d at 478). Courts examine the following non-exhaustive "digits of confusion" in evaluating likelihood of confusion:

> (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. No digit is dispositive, and the digits may weigh differently from case to case, "depending on the particular facts and circumstances involved."

*Id.* (citation omitted) (quoting *Marathon Mfg. Co. v. Enerlite Products Corp.*, 767 F.2d 214, 218 (5th Cir. 1985)).  The Court considers the factors:

1. Sparrow Barns alleges that Ruth Farm infringed on the White Sparrow's trade dress by constructing and advertising the Nest.

2.  As discussed previously, the White Sparrow and the Nest share many similarities.

3. The White Sparrow and the Nest are both barn-themed wedding and event venues.

4. The White Sparrow and the Nest are in the greater Dallas-Fort Worth ("DFW") area— about 90 miles apart—and the likely customers are couples searching for wedding venues in the DFW area (Dkt. #3-7).

5. The advertising media specifically used by both venues is social media and the internet (Dkt. #3 at p. 16; Dkt. #3-6; Dkt. #3-13; Dkt. #3-14; Dkt. #3-15).  While the White Sparrow appears in magazines and other print media, it is unclear whether the Nest also appears in this media.

6. The Court previously found evidence of Ruth Farm's intent to copy Sparrow Barn's trade dress.

7. Sparrow Barns provides more than a mere possibility, or even probability, of customer confusion. Sparrow Barns provides evidence of actual customer confusion of the two venues (Dkt. #3-16).

8. Although Sparrow Barns alleges that some couples book the White Sparrow based on photographs alone, there is no evidence presented by the parties of the care used by potential customers. Due to the nature of the industry and cost of wedding venues, the Court assumes most couples exercise a higher than normal degree of care in selecting a wedding venue.

Considering these factors and the evidence presented, the Court finds that Sparrow Barns can likely succeed on the merits of showing customer confusion. As Sparrow Barns can likely demonstrate the three elements of its trade dress infringement claim, Sparrow Barns meets the first factor for obtaining a preliminary injunction.

## II.    Substantial Threat of Irreparable Harm

To meet the next factor for obtaining a preliminary injunction, Sparrow Barns must show that there is a substantial threat that Sparrow Barns will suffer irreparable harm if an injunction is not granted. An irreparable injury is one that is more than *de minimis* and cannot be undone through monetary remedies. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008). In trademark infringement cases, many courts presume the existence of an irreparable injury if the plaintiff establishes a substantial likelihood of confusion. *See TWTB, Inc. v. Rampick*, 152 F. Supp. 3d 549, 576–77 (E.D. La. 2016) (citing *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013); *Equibrand Corp. v. Reinsman Equestrian Products, Inc.*, 307-CV-0536-P, 2007 WL 1461393, at *15 (N.D. Tex. May 17, 2007); *Ramada Franchise Sys., Inc. v. Jacobcart, Inc.*, CIVA 3:01CV0306D, 2001 WL 540213, at *3 (N.D. Tex. May 17, 2001). To the extent this presumption applies, the Court presumes irreparable harm based upon the likelihood of confusion discussion above. *See T-Mobile US, Inc. v. AIO Wireless LLC*, 991

F. Supp. 2d 888, 928 (S.D. Tex. 2014) (noting the presumption is "somewhere between shaky and reaffirmed" in the Fifth Circuit); *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 694–96 (N.D. Tex. 2015) (discussing the presumption).

Even if the presumption does not apply, the Court finds there is a substantial threat that Sparrow Barns will suffer irreparable harm if an injunction is not granted for three reasons. First, Sparrow Barns will likely lose customers and vendors if couples mistake the Nest for the White Sparrow. *See Paulsson*, 529 F.3d at 313 (considering loss of business and customer confusion substantial threats). As cited above, there is actual evidence of customer and vendor confusion. Second, as Sparrow Barns cannot control Ruth Farm's use of its trade dress, it is powerless to control its reputation and place in the market without an injunction. *ADT, LLC*, 145 F. Supp. 3d at 696 (citations omitted) (considering the loss of control of reputation and place in the market irreparable harm). Third, there is the potential that Sparrow Barns will suffer irreparable harm to its customer goodwill and reputation because of Ruth Farm's use of Sparrow Barn's trade dress (Dkt. #3 at p. 18). The injury to Sparrow Barn's control of its trade dress, customer goodwill, reputation, and potential loss of customers and vendors is difficult to quantify and likely cannot be fully compensated with monetary remedies. *See Paulsson*, 529 F.3d at 313. Accordingly, even if the presumption does not apply, there is evidence that Sparrow Barns will suffer irreparable harm without an injunction.

In response, Ruth Farm again raises its "other white barns" argument:

> Defendant calls the court[']s attention to the fact that there are white wedding barns throughout the country, many with chandeliers and columns inside. Likewise, several of them have walls full of windows to maximize the natural light for the photographer. All of these barns could be confused with the others. The mere existence of other white barns that hold weddings is insufficient grounds to show irreparable harm, despite a few people being confused.

(Dkt. #11 ¶ 4).  Ruth Farm oversimplifies the White Sparrow's trade dress.

The Court again uses the example of *Two Pesos*.  932 F.2d at 1113.  The trade dress of Taco Cabana's restaurant was not that it was a Mexican restaurant.  *Id.* at 1117.  Instead, Taco Cabana's trade dress was the aesthetic arrangement of its Mexican restaurant:

> [A] festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

*Id.* at 1117.  The fact that there are many other Mexican restaurants did not prevent Taco Cabana from establishing the trade dress for its Mexican restaurants.

Here, the alleged trade dress of the White Sparrow is not that it is a "white barn." Instead, Sparrow Barn's trade dress is the aesthetic arrangement of the White Sparrow:

> The Grand Hall features a large, open floor plan with exposed, decorative, wrapped and framed, vaulted wooden beams placed laterally across the wooden cathedral ceiling; exposed, decorative, wrapped and framed wooden columns placed vertically along the wooden side walls; tiered exposed bulb candelabra chandeliers; rustic whitewashing of the wooden interior features; and a stylistic, stacked window display along the back wall.

(Dkt. #3 at pp. 11–12).  The fact that there are many other white barns will likely not prevent Sparrow Barns from establishing protectable trade dress for the specific arrangement of its white barn.  Therefore, Ruth Farm's "other white barns" argument does not mitigate the irreparable harm identified above.

## III.  Weighing the Injury

Under the third factor required to demonstrate the necessity for a preliminary injunction, Sparrow Barns must demonstrate that the threatened injury outweighs any damage that the

injunction might cause Ruth Farm. There are three identifiable injuries to Sparrow Barns discussed above: (1) loss of customers and vendors, (2) loss of control of trade dress, and (3) the potential that Sparrow Barns will suffer harm to its customer goodwill and reputation. In response, Ruth Farm contends Sparrow Barns fails "to show how its reputation will be harmed if certain consumers think that all white barns look alike. . . . If anything, some consumers may mistakenly inflate the reputation of [Sparrow Barns'] barn by confusing [Ruth Farm's] barn for it." (Dkt. #11 at ¶ 5). Although not specified, the Court assumes Ruth Farm will also likely lose customers and business if the injunction is granted. Considering these injuries, the Court finds that the threatened injury to Sparrow Barns outweighs the damages that might be caused to Ruth Farm if the Court issues a preliminary injunction.

## IV.    Public Interest

To meet the final factor demonstrating that a preliminary injunction should be issued, Sparrow Barns must show that the injunction will not disserve the public interest. "'The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks.'" *T-Mobile*, 991 F. Supp. 2d at 929 (quoting *Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999)). When a plaintiff demonstrates a substantial likelihood of success on a trade dress infringement claim, a preliminary injunction serves the public interest as the trade dress is entitled to protection. *See TWTB*, 152 F. Supp. 3d at 578. Sparrow Barns demonstrates a likelihood of success on the merits of its trade dress infringement claim. Therefore, a preliminary injunction will not disserve the public interest. As Sparrow Barns clearly carries its burden of persuasion on all four requirements of the preliminary injunction analysis, the Court will enjoin Ruth Farm with a preliminary injunction.

## CONCLUSION

It is therefore **ORDERED** that Sparrow Barn's Emergency Motion for Temporary Restraining Order and Preliminary Injunction is hereby **GRANTED** (Dkt. #3). Pursuant to Federal Rule of Civil Procedure 65, Ruth Farm is **ENJOINED** from (1) selling, offering for sale, distributing or advertising in commerce its services displaying the trade dress owned by Sparrow Barns and (2) must remove from commerce any advertisement or offer to sale in commerce its services displaying the trade dress owned by Sparrow Barns on Ruth Farm's website, social media, and accounts with third parties, within **three (3) days** from the signing of this order.

Pursuant to Federal Rule of Civil Procedure 65(c), Sparrow Barns is ordered to post a bond in the amount of $500, by depositing this amount with the Clerk of the Court within **three (3) days** of the signing of this order.

**IT IS SO ORDERED.**
**SIGNED this 10th day of April, 2019.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE